IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

LATRON REDOLOS WARE,         )
                                            )
         Petitioner,            )
                                            )
     v.                         )        CV 116-014
                                            )    (Formerly CR 111-270)
UNITED STATES OF AMERICA,    )
                                            )
         Respondent.       )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Petitioner Latron Redolos Ware filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. Petitioner raises numerous claims for relief, including that trial counsel misadvised Petitioner to reject the government's first plea offer, failed to communicate a second plea offer, and caused Petitioner to accept a third, less favorable plea offer. As to the plea offer claim only, the Court appointed David Stewart to represent Petitioner and conducted an evidentiary hearing on September 7, 2017. Based on the evidence of record, the Court **REPORTS** and **RECOMMENDS** the § 2255 motion be **DENIED**, this civil action be **CLOSED**, and a final judgment be **ENTERED** in favor of Respondent.

## I.      BACKGROUND

### A.      Indictment

On October 10, 2012, a grand jury returned a second superseding indictment charging Petitioner and his codefendants with conspiracy to distribute and possess with intent to

distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count One), possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Two), and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(h), and 2 (Count Three). United States v. Ware, CR 111-270, doc. no. 186 (S.D. Ga. Oct. 10, 2012) ("CR 111-270"). Petitioner hired attorney Jacque D. Hawk to represent him. Id., doc. no. 76.

### B.     Agreement to Plead Guilty

On April 19, 2013, Petitioner pleaded guilty to the drug and money laundering conspiracy charges in Counts One and Three. Id., doc. nos. 263, 264. The plea agreement contained a factual basis for the plea, which stated in relevant part:

> [B]eginning on or about January 1, 2006 . . . the defendant . . . did knowingly and intentionally combine, conspire, confederate, and agree together with other persons . . . to distribute and possess with intent to distribute 5 kilograms or more of cocaine hydrochloride, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841 (a)(1), 841(b)(1)(A), all done in violation of Title 21, United States Code, Section 846. . . . [B]eginning . . . at least as early as January 1, 2006 . . . the defendant . . . would knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of . . . conspiracy to possess with intent to distribute and to distribute controlled substances and possession with intent to distribute controlled substances, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity [and] knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(I), all done in violation of Title 18, United States Code, Sections 1956(h) and 2. . . .

Id., doc. no. 264-2, pp. 5-7.

The parties stipulated "based on the evidence available to the government at this time, the quantity of controlled substances to be attributed to the defendant under this plea agreement is at least 15 kilograms of cocaine hydrochloride but less than 50

kilograms of cocaine hydrochloride." Id. at 6.

The plea agreement also contained an appeal and collateral attack waiver, as follows:

> To the maximum extent permitted by federal law, the defendant voluntarily and expressly waives the right to appeal the conviction and sentence and the right to collaterally attack the conviction and sentence in any post-conviction proceeding, including a § 2255 proceeding, on any ground, except that: the defendant may file a direct appeal of his sentence if it exceeds the statutory maximum; and the defendant may file a direct appeal of his sentence if by variance or upward departure, the sentence is higher than the advisory sentencing guideline range as found by the sentencing court.

Id. at 5.

Petitioner attested he read the plea agreement, understood what it said and meant, and it accurately set forth the terms and conditions of the agreement as negotiated by his attorney on his behalf and with his permission. Id. at 13.

### C.     Change of Plea Hearing

During the change of plea hearing, Chief United States District Judge J. Randal Hall established Petitioner's competence to enter a guilty plea if he desired. Id., doc. no. 322, pp. 4-6, 41. Petitioner testified under oath he had adequate time to discuss his case with Mr. Hawk and was entirely satisfied with the services rendered by him. Id. at 8-9. Judge Hall read each count of the indictment and asked if Petitioner understood the charges. Id. at 6-8. Petitioner confirmed he understood. Id. at 8. Judge Hall also explained the rights Petitioner would be waiving by pleading guilty, and Petitioner affirmed he clearly understood those rights. Id. at 9-11.

Among the rights explained, Judge Hall reviewed the right to trial by jury, the presumption of innocence, the government's burden to prove guilt beyond a reasonable doubt, the right to present and cross-examine witnesses, and the right to remain silent. Id.

Petitioner affirmed no one had forced, threatened, or pressured him to plead guilty, nor had anyone predicted or prophesied Petitioner would receive a specific sentence. Id. at 3, 18.

Judge Hall reviewed the waiver provision in Petitioner's plea agreement, informing Petitioner he was "voluntarily and expressly waiv[ing] or giv[ing] up [his] right to appeal [his] conviction and sentence and also to attack [his] conviction and sentence in a post-conviction proceeding." Id. at 13. Judge Hall explained Petitioner could appeal if Petitioner was sentenced above the guideline range, above the statutory range, or if the government appealed. Id. Petitioner confirmed he agreed to the waiver. Id. at 14. Petitioner affirmed he discussed the plea agreement with counsel, signed the plea agreement, and understood he would be bound by all the terms within the plea agreement. Id. Judge Hall described the statutory penalties and elements for Counts One and Three. Id. at 14-15, 18-19. Petitioner stated he understood the penalties and admitted his conduct would satisfy the elements of the counts to which he was pleading guilty. Id. at 15, 19.

Judge Hall heard the factual basis for Petitioner's guilty plea from Special Agent Jamie Lukich with the Drug Enforcement Administration (DEA) and Edward Lauduski, a financial investigator with the United States Department of Justice. Id. at 20, 26. SA Lukich testified that, on January 26, 2011, Cleveland Hall was stopped by the Warren County, Georgia, police and found to possess fourteen kilograms of cocaine. Id. at 20-22. Law enforcement officials later determined Glenn Cook, a known drug trafficker in Atlanta, Georgia, was the source of the cocaine. Id. at 23. After his indictment in the Northern District of Georgia, Cook began cooperating with law enforcement and identified Petitioner and co-defendant Abdul Jabbar Mack as the recipients of the cocaine seized from Hall's car.

4

Id.  Cook further stated he had been supplying Petitioner and Mack with cocaine prior to that date and Hall was their carrier.  Id.

Mr. Lauduskie testified Petitioner claimed a total of approximately $91,000 on his income tax returns from 2007 through 2011, yet made deposits and cash expenditures in the amount of approximately $506,000 over this same period.  Id. at 32, 38.  Mr. Lauduskie concluded this excess income came from selling drugs.  Id. at 28.  In a 2007 credit application, Petitioner alleged he earned $8,500 per month from Made Entertainment, a joint business venture with Ware.  Id. at 30.  However, Made Entertainment showed no income on its tax returns for 2006, 2007, and 2008.  Id. at 30.  In a 2008 credit application, Petitioner alleged a $64,000 annual salary from the United States Postal Service, but Petitioner only worked for the Postal Service twenty-one days in 1995 as a Christmas casual employee.  Id. at 30-31.  Mr. Lauduskie concluded Petitioner's credit application statements were made to disguise the source of his income.  Id. at 31.

Petitioner did not disagree with the testimony of SA Lukich or Mr. Lauduskie and admitted his guilt regarding Counts One and Three.  Id. at 39-40.  Judge Hall accepted the guilty plea, finding a sound factual basis for it, and found Petitioner's decision to plead guilty was voluntary, knowing, and not the result of force, pressure, threats, or promises.  Id. at 41-42.

**D.**     **Presentence Investigation Report (PSI)**

The PSI set Petitioner's base offense level for Count One at thirty-four, pursuant to U.S.S.G. § 2D1.1, and Petitioner's base offense level for Count Three at forty, pursuant to U.S.S.G. § 2S1.1.  PSI ¶¶ 52, 58.  Petitioner's offense level for Count One increased to forty after enhancements for: (1) organizer or leader of a criminal activity that involved five or

more participants, and (2) pattern of criminal conduct engaged in as a livelihood.  PSI ¶¶ 53, 55.  Petitioner's offense level for Count Three increased to forty-two after an enhancement for his concurrent conviction under 18 U.S.C. § 1956.  PSI ¶ 59.  Because the adjusted offense level from Count Three resulted in the higher offense level, Petitioner's combined adjusted offense level was forty-two.  PSI ¶ 65.  This offense level decreased three points for acceptance of responsibility resulting in a total offense level of thirty-nine.  PSI ¶¶ 66-69.

Petitioner received two criminal history points for adult criminal convictions pursuant to U.S.S.G. § 4A1.1(c):  (1) a 1996 misdemeanor conviction for deposit account fraud; and (2) a 1998 misdemeanor conviction for deposit account fraud.  PSI ¶¶ 70, 72.  Accordingly, Petitioner's criminal history score of two established a criminal history category of II.  PSI ¶ 76.  Based on a total offense level of thirty-nine and a criminal history category of II, Petitioner's guideline imprisonment range was 292 to 365 months.  PSI ¶ 103.

**E.    Sentencing**

Sentencing was held on October 15, 2013.  CR 111-270, doc. no. 319.  Through counsel, Petitioner filed sixteen objections to the PSI.  See PSI Addendum.  Objections one, two, and five through ten were points of clarification regarding the facts stated in the PSI.  Id. ¶¶ 1, 2, 5-10.  Judge Hall acknowledged each of these points of clarification.  CR 111-270, doc. no. 319, pp. 6, 16-20.   Objection three challenged paragraphs ten through thirteen, fifteen, sixteen, and twenty of the PSI on the basis that the statements were hearsay from confidential informants.  PSI Addendum ¶ 3.  Objection four challenged paragraph fourteen of the PSI as irrelevant to Petitioner's case.  Id. ¶ 4.  Objection eleven challenged paragraph thirty-eight regarding the calculation of Petitioner's unexplained income.   Id. ¶ 11. Objection twelve challenged application of the criminal livelihood enhancement under

6

U.S.S.G. § 2D1.1(b)(14)(E).  Id. ¶ 12.  Objection thirteen challenged application of the role in the offense enhancement under U.S.S.G. § 3B1.1(a).  Id. ¶ 13.  Objection fourteen challenged application of the two-point enhancement under U.S.S.G. § 2S1.1(b)(2)(B) as "double counting."  Id. ¶ 14.  Objection fifteen challenged inclusion of Petitioner's 1996 for six counts of deposit account fraud in his criminal history score because there was no proof the conspiracy started within ten years of that offense.  Id. ¶ 15.  Finally, objection sixteen challenged the criminal history category of II.  Id. ¶ 16.

At sentencing, after hearing arguments from Assistant United States Attorney (AUSA) Rhodes, Mr. Hawk, and Petitioner, as well as additional testimony from Mr. Lauduski, Judge Hall overruled the objections, adopted the PSI statements as the Court's findings of fact, and determined the applicable guidelines range was 292 to 365 months.  CR 111-270, doc. no. 319, pp. 13-14, 64, 68, 72-73, 78-79.

Judge Hall heard statements in mitigation from Dr. Iyana Burns, Derrick Brody, and Petitioner.  Id. at 80-86.  Judge Hall outlined aggravating factors.  Petitioner was a major distributor of cocaine hydrochloride in the Augusta, Georgia, area.  Id. at 87.  Petitioner was a high-ranking member in the distribution operation, using multiple couriers to transport quantities of cocaine likely exceeding 400 kilograms in vehicles outfitted with hidden compartments or traps.  Id.  Finally, Judge Hall noted Petitioner's lack of concern for the communities into which his drugs were distributed.  Id.  Judge Hall dismissed Count Two and sentenced Petitioner to 360 months of incarceration, five years of supervised release, a $200.00 special assessment, and a $3,000 fine.  Id., doc. no. 301.

### F.    Subsequent Proceedings

Petitioner appealed his sentence to the Eleventh Circuit Court of Appeals.  Id., doc.

7

no. 304.  Petitioner raised several issues on appeal, including whether the court erred by:  (1) enhancing Petitioner's sentence for a leadership role based on hearsay and in violation of his Sixth Amendment right to confrontation; (2) enhancing Petitioner's sentence for criminal livelihood without sufficient evidence; (3) finding criminal history points for the 1996 conviction where there was no proof the conspiracy began within ten years of the conviction; (4) applying Rule 2S1.1; (5) finding a sufficient factual basis for the guilty plea; and (6) imposing a sentence that is unreasonable under <u>Gall v. United States</u>, 552 U.S. 38 (2007). (Doc. no. 7-1, p. 7.) The government filed a motion to dismiss the appeal based on the appeal waiver in Petitioner's plea agreement.  (Doc. no. 7-2, pp. 4-7.)

On October 14, 2014, the Eleventh Circuit granted the government's motion to dismiss as it related to Petitioner's sentencing claims based on his valid appeal waiver but denied the motion as to his challenge to the sufficiency of the factual basis underlying his conspiracy to commit money laundering conviction.  <u>United States v. Ware</u>, 580 F. App'x 880, 880 (11th Cir. 2014) (per curiam).   The court found a sufficient factual basis for the guilty plea and affirmed Petitioner's convictions.  <u>Id.</u>

On December 8, 2014, Petitioner filed a motion to reduce his sentence on the basis of Amendment 782 to the United States Sentencing Guidelines, which retroactively revised the guidelines applicable to drug trafficking offenses.  CR 111-270, doc. no. 327.  Judge Hall granted Petitioner's motion on September 9, 2015, and reduced Petitioner's sentence from 360 months to 287 months. <u>Id.</u>, doc. 340.

On February 3, 2016, Petitioner timely filed this 28 U.S.C. § 2255 motion.  (Doc. no. 1.)  Petitioner alleges trial counsel was ineffective by: (1) misadvising Petitioner to reject the government's first plea offer and accept a less favorable plea offer, and failing to inform

Petitioner about a second plea offer; (2) failing to challenge Petitioner's criminal history score regarding his 1996 conviction, (3) failing to challenge the sufficiency of the factual basis for Petitioner's plea to the money laundering conspiracy; and (4) failing to challenge the impact of the use of a suspended sentence in his criminal history score calculation.  (See generally, doc nos. 1, 2, 24.)  Respondent asserts Petitioner's claims are procedurally barred, barred by the collateral attack waiver, not congnizable in a § 2255 motion, barred by Petitioner's knowing and voluntary guilty plea, or otherwise meritless.  (Doc. nos. 5, 25.)  On September 7, 2017, the Court held a hearing on Ground One and heard testimony from Petitioner and Mr. Hawk.

### 1.    Evidence and Testimony Regarding Plea Negotiations.

Because Petitioner's original § 2255 motion and memorandum were unsworn, the Court directed Petitioner to submit a sworn declaration concerning the exact nature of his Ground One claims.  (See doc. no. 11.)  Petitioner explained in his sworn declaration Mr. Hawk initially told him not to accept any plea offer because the "government had nothing that would stick."  (Doc. no. 16, p. 2.)  Petitioner agreed to "take [Mr. Hawk's] lead and proceed to trial."  (Id.)  However, after co-defendant Mack pleaded guilty, Mr. Hawk changed his advice, telling Petitioner "the government has you dead to rights."  (Id.)  Petitioner asked Mr. Hawk what had changed since his initial advice, and Mr. Hawk told him "nothing" and he would be convicted at trial if he did not plead.  (Id.)  Mr. Hawk then urged Petitioner to sign the third and final plea agreement.  (Id.)  Petitioner states he would have pleaded guilty to the original offer if Mr. Hawk had given him this advice earlier because he "knew [he] was guilty and would have to spend time in prison . . . ."  (Id.)

At the evidentiary hearing, Petitioner testified as follows.  Petitioner first met Mr. Hawk on August 1, 2012, at the Jefferson County jail.  (Court's recording system, *For the Record*, ("FTR") 12:04:46 – 12:04:56.)  Mr. Hawk visited him at the jail on August 6, 2012, to discuss the case.  (FTR 12:05:53 – 12:06:07.)  Mr. Hawk visited Petitioner again on October 15, 2012, to inform Petitioner about the second superseding indictment, which added the money laundering conspiracy charge.  (FTR 12:06:34 – 12:06:59.)  Petitioner received the discovery binders from Mr. Hawk around that time.  (FTR 12:17:18 – 12:17:36.)  Petitioner had a notepad in which he wrote notes related to his review of the discovery.  (FTR 12:11:46 – 12:11:53.)

AUSA Patricia Rhodes made the first plea offer in January 2013, and she came to the jail with Mr. Hawk to discuss the offer.  (FTR 12:08:02 – 12:08:18.)  Petitioner testified Ms. Rhodes "laid out the deal clearly," indicating:  (1) a stipulation to a drug quantity of fifty to one hundred fifty kilograms, which would result in a base offense level of thirty-six; (2) a two-point criminal livelihood enhancement; (3) a two-point leadership role enhancement; and (4) a three-point reduction for acceptance of responsibility, resulting in an offense total of thirty-seven and a sentence of between seventeen and twenty-two years.  (FTR 12:08:24 – 12:09:09.)  The first offer included a guideline stipulation and an agreement regarding which enhancements would apply.  (FTR 12:29:02 – 12:29:05; 12:36:02 – 12:36:18.)  Mr. Hawk took Petitioner's notepad before the meeting.  (FTR 12:11:55 – 12:12:07.)  Mr. Hawk's handwritten notes in his notebook reflect the first deal.  (FTR 12:08:25 – 12:08:34; doc. no. 23-3, p. 2.)  Ms. Rhodes gave him the deal in writing, and Petitioner attempted to give the document to Mr. Hawk, but Ms. Rhodes stopped him from doing so and said he could discuss it with Mr. Hawk later.  (FTR 12:09:21 – 12:09:42.)  Petitioner does not have a copy because Mr. Hawk took it from him.  (FTR 12:37:22 – 12:37:35.)

After Ms. Rhodes left, Petitioner discussed the deal with Mr. Hawk. (FTR 12:09:42 – 12:09:54.) Petitioner was nervous and asked Mr. Hawk what he thought. (FTR 12:09:54 – 12:10:13.) Mr. Hawk told Petitioner the deal "was some crap," the government had no witnesses he could not handle, and the government's arguments were very weak. (FTR 12:10:13 – 12:10:29.) Mr. Hawk did not discuss the potential testimony of Glenn Cook at that time. (FTR 12:10:30 – 12:10:37.) Mr. Hawk's main concern was having Petitioner focus on the case and not worry about the government. (FTR 12:10:37 – 12:10:45.) Petitioner wanted to accept the deal, but Mr. Hawk told Petitioner he was not hired to take a deal. (FTR 12:10:54 – 12:11:07.) Mr. Hawk told Petitioner to continue reviewing the discovery binders and he would come back to see him. (Id.) Petitioner and Mr. Hawk did not discuss discovery prior to the January 25, 2013 meeting. (FTR 12:11:36 – 12:11:46.) Petitioner asked Mr. Hawk during the January 25th meeting how he could be charged with a livelihood enhancement regarding the money laundering charge, and Mr. Hawk could not give him a straight answer. (FTR 12:23:30 – 12:24:04.) Mr. Hawk gave Petitioner his notepad back after the meeting. (FTR 12:12:50 – 12:12:54.) Petitioner continued making notes about discovery in his notepad after the January 25th meeting. (FTR 12:12:55 – 12:13:04.) Mr. Hawk "never showed back up" and they did not discuss the first offer again after the January 25th meeting. (FTR 12:13:28 – 12:13:54.)

Petitioner wanted to take the offer presented during the January 25th meeting, but Mr. Hawk advised him not to. (FTR 12:20:40 – 12:20:51.) Petitioner turned down the first deal based on Mr. Hawk's advice. (FTR 12:17:11 – 12:17:19.) Petitioner "definitely probably wouldn't have" turned down the first deal but for Mr. Hawk's advice as he "was leaning more so to signing the deal." (FTR 12:17:22 – 12:17:39.) Petitioner wanted to plead before codefendant Mack because he knew "things could get messy" and worse for him, and he was

11

worried by what Ms. Rhodes said during the meeting.  (FTR 12:26:33 – 12:26:55.) Petitioner asked Mr. Hawk to continue negotiating with Ms. Rhodes.  (FTR 12:17:54 – 12:18:04.)  Petitioner did not tell Mr. Hawk to tell Ms. Rhodes he was turning down the first offer.  (FTR 12:17:02 – 12:17:08.)

Mr. Hawk never communicated to Petitioner the offer contained in a February 8, 2013 email from Ms. Rhodes either verbally or in writing.  (FTR 12:15:52 – 12:16:10.)[1]  Petitioner had no phone calls with Mr. Hawk after the January 25th meeting.  (FTR 12:16:12 – 12:16:18.)  Petitioner tried to contact Mr. Hawk, but Mr. Hawk would not take his calls. (FTR 12:21:10 – 12:21:20.)  Petitioner would speak to Mr. Hawk on three-way calls prior to sentencing but not during plea negotiations.  (FTR 12:21:20 – 12:21:40.)  Mr. Hawk did not send Petitioner anything in writing about the offers.  (FTR 12:21:55 – 12:22:01.)

Mr. Hawk returned to the jail on February 25, 2013.  (FTR 12:16:12 – 12:16:18.)  No deals were discussed at that meeting.  (FTR 12:14:05 – 12:14:12.)  Mr. Hawk told Petitioner Mack would be pleading guilty.  (FTR 12:14:12 – 12:14:23.)  Mr. Hawk had not discussed the possibility of Mack pleading guilty before this.  (FTR 12:14:24 – 12:14:32.)  Mr. Hawk took the discovery binders from Petitioner and told Petitioner he would review his notes and come back to discuss them.  (FTR 12:18:38 – 12:19:20.)  Mr. Hawk had not looked through the discovery before obtaining the binders from Petitioner.  (FTR 12:23:22 – 12:23:27.)  Mr. Hawk "may have" looked over certain issues in the case but "not the whole thing."  (FTR 12:23:57 – 12:24:04.)

---

[1]The offer presented in the February 8th email resulted in the same sentencing range as the initial January offer even though the second superseding indictment added the money laundering charge.  The February 8th offer did so by including a stipulation to a lesser drug quantity of fifteen to fifty kilograms to offset the conspiracy to commit money laundering charge.  (See doc. no. 32-2, p. 2.)

Petitioner was present for the pretrial conference on February 26.  (FTR 12:15:16 – 12:15:22.)  Nobody discussed a plea deal at the pretrial conference.  (FTR 12:15:28 – 12:15:36.)

Petitioner signed a plea agreement in April 2013.  (FTR 12:20:11 – 12:20:16.)  The agreement had a stipulation for a lower drug quantity of fifteen to fifty kilograms.  (FTR 12:33:33 – 12:33:44.)  Mr. Hawk visited on April 11 and 15, 2013, to discuss the deal.  (FTR 12:20:24 – 12:20:30.)  They discussed the plea offer he eventually accepted as well as the previous offers.  (FTR 12:24:11 – 12:24:38.)  Petitioner asked Mr. Hawk why the guideline range "wasn't binding like it was the first time," but Mr. Hawk told him he "absolutely had to take the deal."  (FTR 12:38:05 – 12:38:17.)  Petitioner did not know whether the deal was going to be better than the previous offers.  (FTR 12:24:40 – 12:24:48.)  They did not discuss going to trial when discussing the final offer because Petitioner wanted to plead guilty.  (FTR 12:25:03 – 12:25:18.)  They discussed the evidence, and Mr. Hawk's assessment of the evidence in April was different than it was in January.  (FTR 12:24:20 – 12:25:34.)  In April, Mr. Hawk said the government had him "dead to the [sic] rights," but Mr. Hawk did not say that in January.  (FTR 12:25:41 – 12:26:07.)

Petitioner pleaded guilty on April 19, 2013.  (FTR 12:20:31 – 12:20:38.)  At the change of plea hearing, Judge Hall put Petitioner under oath and questioned him about his plea.  (FTR 12:31:23 – 12:31:46.)  Judge Hall told Petitioner a guideline range would be used to calculate his sentence, and he would take that range under advisement but could sentence Petitioner outside of that range.  (FTR 12:31:47 – 12:32:18.)  Petitioner was first informed during the hearing any estimation of his guideline range other than by probation or the court was only an estimation; neither Mr. Hawk nor Ms. Rhodes ever told him their estimations were not binding.  (FTR 12:38:23 – 12:38:54.)  Petitioner understood how the guidelines

would apply and told Judge Hall during the hearing nobody promised him a specific sentence.  (FTR 12:32:20 – 12:32:35; 12:37:54 – 12:38:05.)

### 2.    Mr. Hawk's Testimony

Mr. Hawk has more than thirty years of experience as an attorney, and has represented approximately 100 defendants in federal court.  (FTR 10:19:50 – 10:20:30.)  Mr. Hawk is familiar with his obligations regarding communicating plea offers to clients.  (FTR 10:20:30 – 10:20:50.)

Petitioner retained Mr. Hawk for the underlying criminal case , and jail records show their first meeting in person was on August 1, 2012, but Mr. Hawk does not recall the meeting.  (FTR 10:20:30 – 10:21:05.)  Mr. Hawk filed "numerous" discovery motions on August 31 and September 6, 2012.  (FTR 10:22:30 – 10:22:45.)  It was the general practice of the U.S. Attorney's Office to hand over discovery by the initial appearance or arraignment.  (FTR 10:22:45 – 10:23:15.)  Mr. Hawk began to go through the discovery, facts, and evidence after issuance of the first superseding indictment on July 11, 2012.  (FTR 10:24:00 – 10:24:22.)

On September 12, 2012, Petitioner's fiancée picked up discovery, which was contained in eleven three-inch or four-inch binders, from Mr. Hawk's office to deliver to Petitioner.  (FTR 11:26:08 – 11:26:28; 11:17:15 – 11:17:47.)  Mr. Hawk's standard practice was to send discovery to clients for review.  (FTR 11:26:35 – 11:26:43.)  The client would then point out any disagreements with the government's version of the evidence, and Mr. Hawk would work with the client toward a litigation strategy.  (FTR 10:27:47 – 10:28:04.)  Mr. Hawk has followed this procedure for thirty-three years.  (FTR 10:28:10 – 10:28:31.)

On October 15, 2012, Mr. Hawk met with Petitioner to discuss the second superseding indictment, which added the money laundering conspiracy charge.  (FTR

10:23:40 – 10:23:53; 10:25:50 – 10:26:00.)  It was still early in the case, and they were still receiving discovery, determining what defenses may apply, and determining whether the case could go to trial.  (FTR 10:26:15 – 10:26:37.)  The arraignment for the second superseding indictment took place on October 17, 2012.  (FTR 10:24:23 – 10:24:50.)  Mr. Hawk does not recall receiving additional discovery that day but knows he received discovery related to the money laundering claim later.  (Id.)

Mr. Hawk recalls there being a "number of problems" to his defense due to codefendants testifying or willing to testify about the cocaine operation.  (FTR 10:29:19 – 10:29:36.)  Mr. Hawk was concerned by the potential testimony of Cook as the main supplier of cocaine.  (FTR 10:29:50 – 10:30:15.)  Mr. Hawk discussed these problems with Petitioner, particularly the problem with Cook because he had already taken a plea deal in exchange for testimony.  (FTR 10:30:22 – 10:31:00.)  Mr. Hawk believed there were a lot of risks associated with trial because of the anticipated testimony.  (FTR 10:31:35 – 10:31:43.)  Mr. Hawk and Petitioner discussed potential plea agreements, but they did not have a solid offer, so they assumed there was not going to be a good offer and would go to trial.  (FTR 10:31:05 – 10:31:24; 10:31:54 – 10:32:26.)

On January 15, 2013, the parties received their first notice of a trial date for March 11, 2013.  (FTR 10:33:54 – 10:34:14.)  Mr. Hawk spoke with Ms. Rhodes about resolving the case without a trial and received an offer from Ms. Rhodes.  (FTR 10:34:16 – 10:35:10.)  Mr. Hawk knew it would be difficult to get a good deal from the government because of the amount of drugs involved and the other evidence.  (FTR 10:34:12 – 10:35:38.)  The first offer had a minimum guideline range of approximately 210 months.  (FTR 10:35:40 – 10:35:05.)  Mr. Hawk spoke to Petitioner about the offer, but Petitioner wanted a sentence closer to ten years.  (FTR 10:35:50 – 10:36:10.)  Mr. Hawk understood Petitioner was not

happy with the offer but realized the risks at a jury trial were "significant." (FTR 10:36:12 – 10:36:31.)  Mr. Hawk had indications at the time Mack was going to plead guilty and was concerned about Mack's potential testimony because he was "intimately connected" with Petitioner in the organization.  (FTR 10:36:31 – 10:36:47.)  Mr. Hawk believed the risks at trial would be very significant and Petitioner was "liable to get hammered." (FTR 10:36:49 – 10:37:08.)  Mr. Hawk knew Judge Hall typically gave long sentences in this type of case. (FTR 10:37:50 – 10:38:05.)  Petitioner "didn't seem interested at all" in the deal because the sentencing range was too high.  (FTR 10:38:17 – 10:38:37.)

Because Mr. Hawk was not able to convince Petitioner to accept the offer, he asked Ms. Rhodes to come to the jail to present the offer and the evidence that would be presented at trial.  (FTR 10:38:48 – 10:39:28.)  Ms. Rhodes explained the offer was a "one-time deal" and offers would only worsen for Petitioner if more work had to be done on the case.  (FTR 10:39:29 – 10:40:10.)  Mr. Hawk has never asked the government to come to his client to lay out their evidence in any other case but did so here because he felt the risks of trial were too great based on the potential testimony of Mack and Cook.  (FTR 11:37:37 – 11:37:57; 11:46:27 – 11:46:52.)

Mr. Hawk set up the meeting for January 25, 2013.  (FTR 10:40:12 – 10:40:14.)  Mr. Hawk met with Petitioner briefly before the meeting and told him not to say anything or react to anything he heard because he did not want to give the government any inclination about their defense or Petitioner's feelings about the case.  (FTR 10:40:50 – 10:41:16.)  Ms. Rhodes was "very detailed" in setting forth the evidence, expected testimony, and offer. (FTR 10:41:49 – 10:42:10.)  Mr. Hawk's handwritten notes from the meeting indicate the parties would stipulate to a drug quantity of fifty to one hundred and fifty kilograms, resulting in a guideline range of 210-262 months or between approximately seventeen and

twenty-two years.  (FTR 11:13:30 – 10:14:32; see also doc. no. 23-3, p. 2.)  Mr. Hawk indicated the range calculated there was "what [his] thoughts were at the time based on [his] calculations."  (FTR 11:17:26 – 11:17:36.)  It was "unusual" for Mr. Hawk and Ms. Rhodes to "work[] the calculation" together, but they did so to create the best estimate of what Petitioner would receive.  (FTR 11:17:36 – 11:17:55.)  Mr. Hawk and Ms. Rhodes created the best guideline range estimate they could under the circumstances, although he acknowledged probation officer calculations can differ.  (FTR 11:17:55 – 11:18:12.)

Mr. Hawk spoke with Petitioner immediately after the meeting, but Petitioner "still did not want to take the deal" because it would involve too much time.  (FTR 10:42:35 – 10:42:45; 10:43:18 – 10:43:21.)  Mr. Hawk advised Petitioner to accept the offer.  (FTR 10:55:15 – 10:55:23.)  Petitioner asked Ware if the government makes better offers later. (FTR 10:42:45 – 10:43:05.)  Mr. Hawk said "sometimes they do and sometimes they don't" but told Petitioner Ms. Rhodes was "adamant" about this offer being the best deal he would receive.  (Id.)  After the January 25th meeting, Mr. Hawk did not advise Petitioner to reject the offer and go to trial, and Petitioner did not indicate he would plead guilty.  (FTR 10:48:25 – 10:48:37.)  Mr. Hawk did not tell Petitioner the government did not have enough evidence to convict him.  (FTR 10:48:40 – 10:48:49.)  Mr. Hawk reviewed all of the evidence with Petitioner.  (FTR 10:50:08 – 10:50:14.)  Mr. Hawk does not pressure clients to trial if it is not necessary and does not go to trial "for the fun of it," especially where, as here, trial could have resulted in an even higher sentence.  (FTR 10:53:08 – 10:54:28.)

Mr. Hawk received a revised offer by email on February 8, 2013.  (FTR 10:43:36 – 10:44:28.)  The offer sought to keep the same estimated guideline range after considering the effect of the money laundering charge by reducing the stipulated amount of drugs from fifty to one hundred and fifty kilograms to a stipulated amount of fifteen to fifty kilograms.  (FTR

11:19:40 – 11:20:59.)   Mr. Hawk does not recall specifically how he communicated this offer but is certain he did.  (FTR 10:55:53 – 10:56:03.)  Mr. Hawk believes he communicated the offer during one of many three-way calls with Petitioner during that time.  (FTR 11:49:05 – 11:49:22.)  Mr. Hawk advised Petitioner to accept the first two plea offers they discussed. (FTR 10:56:16 – 10:56:38.)  Petitioner indicated he was not interested in the second deal because it had the same guideline range as the first.  (FTR 11:50:47 – 11:51:08.)  Mr. Hawk does not recall when or where he communicated Petitioner's rejection of the government's offers but knows they began preparing for trial again after the offers were rejected.  (FTR 11:53:35 – 11:53:48.)

There was still no plea agreement by the pretrial conference on February 26, 2013, and Mr. Hawk asked for a continuance to prepare for trial.  (FTR 10:45:10 – 10:45:33.)  Mr. Hawk learned Mack "pled out" around that time and was concerned because Mack knew more about Petitioner than anyone else involved.  (FTR 10:45:55 – 10:46:18.)  Mr. Hawk said Mack taking a deal was the "last nail in the coffin" and the "trial situation . . . was virtually unwinnable."  (FTR 10:46:20 – 10:46:37.)

Petitioner indicated he would accept a deal, and Mr. Hawk tried to get the first offer back from the government but could not.  (FTR 11:53:49 – 11:54:06.)  The terms of the first two deals were better than the terms of the final deal.  (FTR 11:29:35 – 11:29:46.)  Mr. Hawk faxed the plea agreement Petitioner ultimately signed to Petitioner on April 8, 2013. (FTR 11:28:55 – 11:29:35.)  Mr. Hawk met with Petitioner to discuss the plea agreement on April 11, 2013, and April 15, 2013.  (Id.)  Petitioner pleaded guilty under the terms of the plea agreement on April 19, 2013.  (FTR 11:21:08 – 11:21:20.)

Mr. Hawk communicated all three plea offers to Petitioner and recommended Petitioner accept each one.  (FTR 11:56:03 – 11:57:10.)

## II.   DISCUSSION

### A.   Under <u>Strickland v. Washington</u>, Petitioner Bears a Heavy Burden on an Ineffective Assistance of Counsel Claim.

Ineffective assistance of counsel claims are subject to the two-part test enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  <u>See</u> <u>Massaro v. United States</u>, 538 U.S. 500, 505 (2003); <u>United States v. Armstrong</u>, 546 F. App'x 936, 940 (11th Cir. 2013).  Under the first prong, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  <u>Strickland</u>, 466 U.S. at 688.  In this regard, "[a] petitioner must overcome a strong presumption of competence, and the court must give significant deference to the attorney's decisions."  <u>Hagins v. United States</u>, 267 F.3d 1202, 1204-05 (11th Cir. 2001).

Strategic decisions are entitled to a "heavy measure of deference."  <u>Strickland</u>, 466 U.S. at 691.  Indeed, "strategic choices are 'virtually unchallengeable.'"  <u>Provenzano v. Singletary</u>, 148 F.3d 1327, 1332 (11th Cir. 1998) (citing <u>Strickland</u>, 466 U.S. at 690).  "[A] court should be highly deferential to those choices made by defense counsel in the conduct of a trial that are arguably dictated by a reasonable trial strategy."  <u>Devier v. Zant</u>, 3 F.3d 1445, 1450 (11th Cir. 1993).  To show that an attorney's choice of strategy is unreasonable, a petitioner must show that no competent counsel would have made such a choice.  <u>Strickland</u>, 466 U.S. at 690.

Thus, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  <u>Id.</u>  "Given the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one."  <u>Fugate v. Head</u>, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted).  "The test has nothing to do with what the best lawyers

would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . ."  Ward v. Hall, 592 F.3d 1144, 1164 (11th Cir. 2010) (citing Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995)).

A court, however, "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697; see Brooks v. Comm'r, Ala. Dep't of Corr., 719 F.3d 1292, 1301 (11th Cir. 2013).  Under the prejudice prong of Strickland, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.

A petitioner must affirmatively prove prejudice that would undermine the results of the proceedings because "attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.  That the errors had some conceivable effect on the outcome of the proceeding is insufficient to show prejudice." Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004) (citations and internal quotations omitted).  Indeed, the Court must examine the entirety of counsel's performance and the effect of such "in light of the record as a whole to determine whether it was reasonably probable that the outcome would have been different."  Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989).  Furthermore, "where the alleged error of counsel is a failure to investigate or discovery potentially exculpatory evidence, the determination

whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." Hill v. Lockhart, 474 U.S. 52, 60 (1985).

Moreover, in the context of a guilty plea, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59; Stephens v. Sec'y, Fla. Dep't of Corr., 678 F.3d 1219, 1225 (11th Cir. 2012), cert. denied, 568 U.S. 966 (2012). In assessing whether a petitioner has met this standard, the Supreme Court has emphasized the "fundamental interest in the finality of guilty pleas." Hill, 474 U.S. at 58. Thus, a petitioner must prove "serious derelictions" in counsel's advice regarding the plea. Stano v. Dugger, 921 F.2d 1125, 1150-51 (11th Cir. 1991) (en banc) (citations omitted). Therefore, Petitioner must show both that counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that but for counsel's errors, he would have insisted on going to trial. Hill, 474 U.S. at 56-59.

   **B.  Petitioner Is Not Entitled to Relief on His Ground One Claims Because Mr. Hawk Communicated the Plea Offers to Petitioner and Encouraged Him to Accept Each One After Thoroughly Reviewing Discovery.**

Petitioner argues Mr. Hawk's representation was ineffective because Mr. Hawk: (1) failed to inform petitioner about the plea offer contained in the February 8, 2013 email from Ms. Rhodes; and (2) did not review the discovery before advising him not to accept the plea offer following the January 25, 2013 meeting. (Doc. nos. 16; 24, p. 2.) For the reasons set forth below, the Court finds Mr. Hawk: (1) communicated all plea offers to Petitioner; (2) reviewed discovery prior to advising Petitioner to plead guilty; and (3) advised Petitioner to plead guilty to each offer the government extended. Because the testimony of Petitioner and

Mr. Hawk diverges substantially on these issues, the Court must make a credibility determination based on the testimony presented at the evidentiary hearing.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing credibility determinations are within province of factfinder); Carr v. Schofield, 364 F.3d 1246, 1264-65 (11th Cir. 2004) (recognizing court's opportunity to observe and study witnesses to make credibility determination concerning testimony on ineffective assistance claim). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citation omitted).

The Court credits the testimony of Mr. Hawk over Petitioner regarding his review of discovery, communication of the plea offers, and advice to Petitioner to accept the plea offers. Mr. Hawk, who is a seasoned attorney with a long history of criminal defense work, is well-known to the Court and has demonstrated himself to be an ethical, thorough, and zealous advocate for his clients. At the hearing, Mr. Hawk's testimony was internally consistent and logically sound, and remained so during cross-examination.

Mr. Hawk recounted his thought process as he became involved in Petitioner's case, specifically his concerns about Petitioner being able to mount a successful defense in the face of testimony from others involved in the drug distribution organization. Mr. Hawk testified

he discussed these concerns with Petitioner and obtained the first plea offer from the government.  (FTR 10:30:22 – 10:31:00; 10:34:16 – 10:35:10.)  Mr. Hawk recommended Petitioner take the deal despite the estimated sentence range because of the amount of drugs involved and the potentially damaging testimony of Petitioner's codefendants.  (FTR 10:35:50 – 11:36:31.)

Petitioner's self-serving testimony is inconsistent and defies common sense.  In his initial motion, Petitioner claimed Mr. Hawk did not discuss the January plea offer substantively with him, but instead told Petitioner out of hand to reject it and he would negotiate a better deal.  (Doc. no. 2, p. 14.)  Faced with Mr. Hawk's affidavit testimony regarding the January 25th meeting with Ms. Rhodes, Petitioner shifted tactics and claimed Mr. Hawk presented the offer to him, and he rejected the offer based on Mr. Hawk's advice.  (Doc. no. 10, p. 3.)  Then, in his sworn statement, Petitioner claimed Mr. Hawk failed to discuss the January offer with him after the January 25th meeting and "only returned" after Mack pleaded guilty.  (Doc. no. 16, p. 2.)  During the evidentiary hearing, however, Petitioner testified he did meet with Mr. Hawk following the January 25th meeting and discussed the January offer before deciding to turn it down and proceed to trial.  (FTR 12:09:42 – 12:09:54.)  Petitioner's conflicting accounts undermine his credibility.

More importantly, the portrait Petitioner paints of Mr. Hawk is self-serving and hyperbolic.  Petitioner casts Mr. Hawk as an uninformed, careless, and even belligerent attorney who steadfastly refused to allow any consideration of the first plea offer, vowing he would secure a victory at trial, and completely failed to communicate the second offer at all.  But then, according to Petitioner, Mr. Hawk changed course completely and demanded Petitioner take the third plea offer because, for the first time, he believed they stood no

23

chance of winning at trial.  Far more convincing is Mr. Hawk's testimony that he reviewed the discovery, determined from the outset that a plea bargain was the optimal solution, and consistently recommended Petitioner take each plea offer as the government made them.

Indeed, Mr. Hawk felt strongly enough Petitioner should take the first plea offer that he took the highly unusual step of arranging the January 25, 2013 meeting with Ms. Rhodes and Petitioner.  Mr. Hawk testified he had never resorted to this measure to convince a client to take a deal in any other case but did so here because of the significant risks of going to trial.  (FTR 11:37:37 – 11:37:57; 11:46:27 – 11:46:52.)  This extraordinary effort of arranging the meeting with Ms. Rhodes portrays a diligent attorney concerned with his client's best interest after thoroughly reviewing the case file and determining a plea offer is the best defense strategy.  It does not portray, as Petitioner suggests, an unprepared and careless attorney who is unjustifiably asking his client to take a plea offer despite being completely ignorant regarding the case facts and potential defenses.  The effort is also consistent with Mr. Hawk's testimony that he diligently communicated all three offers to Petitioner, and advised Petitioner to accept each offer.  (FTR 11:56:03 – 11:57:10.)  Contrary to Petitioner's argument, Mr. Hawk made no statements during the February 26, 2013 pretrial conference indicating he had not yet reviewed discovery.  Mr. Hawk stated he had just received approximately 900 pages of discovery that month despite the government's best efforts and needed additional time to "track down" information based on the new discovery. CR 111-270, doc. no. 362, pp. 5-6.  Mr. Hawk stated he had been "dealing with" the earlier discovery but needed more time to investigate fully the new materials.  (Id. at 6.)  Ms. Rhodes confirmed the government had been supplementing records throughout the pretrial stage, and noted the "biggest bulk of discovery," approximately six thousand pages, were

delivered in October 2012.  (Id. at 7.)  Therefore, Mr. Hawk had been actively investigating the case based on the government's discovery and preparing a defense for trial but needed additional time to prepare for discovery he had only received that same month.

In light of these considerations, the Court credits Mr. Hawk's testimony over Petitioner's and finds Mr. Hawk: (1) communicated each of the plea offers to Petitioner; (2) reviewed the evidence prior to giving Petitioner advice about the plea offers; and (3) advised Petitioner to accept each of the plea deals he received from the government.  Accordingly, Petitioner's claims that Mr. Hawk erroneously advised Petitioner not to accept the first plea offer because he had not reviewed the discovery and failed to communicate the second offer to Petitioner are without merit, and Petitioner is not entitled to relief on his Ground One claims.

### C.    Petitioner Is Not Entitled to Relief Based on Grounds Two and Four.

#### 1.    Because Petitioner's Claims Sound in Ineffective Assistance of Counsel, the Procedural Bar Is Inapplicable.

Respondents argue, to the extent Petitioner seeks to bring stand-alone, sentencing error claims in Grounds Two and Four, the claims are procedurally barred since they could have been raised on direct appeal but were not.  (Doc. no. 7, p. 15.)  However, Petitioner clarifies the nature of his claims in his reply, stating "[Petitioner's] claims sound in ineffective assistance of counsel and as such are not subject to the procedural default doctrine." (Doc. no. 10, p. 1.)  Furthermore, Petitioner states he "recognizes that sentencing errors are incognizable [sic] in 28 U.S.C. § 2255 proceedings" and emphasizes "an ineffective-assistance-of-sentencing-counsel claim is cognizable in § 2255 proceedings." (Id.)  Because Petitioner has made it clear he intends his sentencing claims to be wrapped

into ineffective assistance of counsel claims, the Court will not address Petitioner's claims as if they were stand-alone, sentencing error claims.

### 2.    Petitioner's Valid Collateral Attack Waiver Bars Grounds Two and Four.

Grounds Two and Four of Petitioner's § 2255 motion are precluded by the waiver provision in the plea agreement, in which Petitioner waived his right to collaterally attack his conviction and sentence.  It is well settled a waiver of the right to collaterally attack a sentence and conviction is only enforceable if the waiver is knowing and voluntary.  United States v. Warner-Freeman, 270 F. App'x 754, 757 (11th Cir. 2008); see also United States v. Weaver, 275 F.3d 1320, 1333 (11th Cir. 2001); United States v. Bushert, 997 F.2d 1343, 1345 (11th Cir. 1993); see also Vaca-Ortiz v. United States, 320 F. Supp. 2d 1362, 1365-67 (N.D. Ga. 2004) (applying case law concerning waiver of direct appeal to waiver of right to collateral proceedings).

"To establish the waiver's validity, the government must show either that (1) the district court specifically questioned the defendant about the provision during the plea colloquy, or (2) it is manifestly clear from the record that the defendant fully understood the significance of the waiver." Weaver, 275 F.3d at 1333.  If the government meets this burden, then an appeal and collateral attack waiver is enforceable.  See United States v. Pease, 240 F.3d 938, 942 (11th Cir. 2001) (enforcing waiver provision where defendant was specifically questioned during plea proceedings about waiver); United States v. Howle, 166 F.3d 1166, 1168-69 (11th Cir. 1999); United States v. Benitez-Zapata, 131 F.3d 1444, 1146-47 (11th Cir. 1997).

Here, Respondent has demonstrated the existence of a valid collateral attack waiver. The plea agreement signed and verified by Petitioner fully set forth that, as a condition of his

guilty plea, he was waiving any right to collateral attack of his sentence and conviction or the knowing and voluntary nature of his guilty plea.  See CR 111-270, doc. no. 264-2, p. 5 ("the defendant voluntarily and expressly waives . . . the right to collaterally attack the conviction and sentence in any post-conviction proceeding, including a § 2255 proceeding, on any ground . . . .").  Furthermore, Judge Hall reviewed Petitioner's plea agreement during the plea colloquy, and specifically referenced the waiver provision.  Id., doc. no. 322, p. 12-14.  Judge Hall explained as a result of the waiver provision, Petitioner "agreed to voluntarily and expressly waive or give up [his] right to appeal [his] conviction and sentence and also to attack [his] conviction and sentence in a post-conviction proceeding."  Id. at 13.  Petitioner acknowledged he agreed to the terms of the plea agreement.  Id. at 14.

Thus, the collateral attack waiver bars Petitioner's claims in Grounds Two and Four.  See Williams, 396 F.3d at 1341-42 (11th Cir. 2005) (precluding claim for ineffective assistance of counsel at sentencing based on valid sentence-appeal waiver).  Accordingly, the Court finds Petitioner is not entitled to relief on these grounds.  Even if the collateral attack waiver did not bar these grounds, Ground Four is meritless as explained *infra*.

### 3. Even If Not Barred by the Collateral Attack Waiver, Petitioner's Ineffective Assistance Claims in Ground Four Are Meritless.

In Ground Four, Petitioner argues counsel was ineffective for failing to:  (1) challenge the 1998 conviction for four counts of deposit account fraud counting toward his criminal history score under § 4A1.2(c); (2) challenge the 1998 conviction counting toward his criminal history score under § 4A1.2(f); and (3) object to evidence of the conviction under Federal Rules of Evidence 410, 401, and 403.  (Doc. no. 2, pp. 22-25.)  These claims are without merit.

Mr. Hawk was not ineffective for failing to challenge inclusion of the 1998 conviction under 4A1.2(c).  Misdemeanor convictions for offenses similar to insufficient funds check are only counted under U.S.S.G. § 4A1.2(c) when the conviction results in "a term of probation of more than one year or a term of imprisonment of at least thirty days . . . ." Additionally, "a conviction for which the imposition or execution of sentence was totally suspended or stayed shall be counted as a prior sentence . . . ." U.S.S.G. § 4A1.2(a)(3); United States v. Hernandez, 160 F.3d 661, 670-671 (11th Cir. 1998).  Petitioner was sentenced to twelve months of confinement for his 1998 conviction for four counts of deposit account fraud and the court suspended the sentence.  PSI ¶ 72.  The twelve-month suspended sentence was substantially longer than the thirty-day requirement of § 4A1.2(c). Accordingly, the Court properly counted the 1998 conviction toward Petitioner's criminal history score under § 4A1.2(c).

Mr. Hawk was also not ineffective for failing to challenge inclusion of the 1998 conviction under 4A1.2(f).  Diversions from the judicial process without a finding of guilt are not counted toward a defendant's criminal history score.  U.S.S.G. § 4A1.2(f). However, diversionary dispositions resulting from a finding or admission of guilt or a plea of nolo contendere are counted, even if the conviction is not formally entered.  U.S.S.G. § 4A1.2(f). Petitioner states he "pled guilty" to the 1998 conviction, (doc. no. 2, p. 24), and the record indicates the court entered a formal conviction.  PSI ¶ 72.  Accordingly, the Court properly counted the 1998 conviction toward Petitioner's criminal history score under § 4A1.2(f).

Finally, Mr. Hawk was not ineffective for failing to object to the use of Petitioner's convictions to compute his criminal history score under Federal Rules of Evidence 410, 401, and 403.  With the exception of the rules regarding privileges, the rules of evidence do not

apply at sentencing.  Fed. R. Evi. 1101(d)(3).  Accordingly, there was no basis for objecting to the use of Petitioner's convictions under the rules of evidence.

Accordingly, Petitioner's arguments in Ground Four are without merit and, thus, Petitioner has not demonstrated Mr. Hawk was ineffective.  Winfield, 960 F.2d at 974.

### D.    Petitioner Is Not Entitled to Relief on His Ineffective Assistance Claims in Ground Three.

Petitioner also asserts Mr. Hawk provided ineffective assistance when he failed to challenge count three of the indictment, conspiracy to commit money laundering, on the grounds that (1) Petitioner's conduct was not criminal at the time; and (2) there is no evidence Petitioner acted "knowingly."  (Doc. no. 2, pp. 19-22.)  Respondent argues Petitioner's claim is (1) procedurally barred because the Eleventh Circuit found there was a sufficient factual basis for Petitioner's guilty plea as to count three; and (2) meritless based on Petitioner's admissions and the testimony elicited at Petitioner Rule 11 hearing.  (Doc. no. 7, pp. 24-25.)

Respondent argues Petitioner's claim is procedurally barred because the Eleventh Circuit rejected Petitioner's sufficiency of the factual basis claim on direct appeal.  (Id. at 24.)  When a § 2255 petitioner raises a claim on direct appeal, he may not relitigate the claim in collateral proceedings under a different legal theory.  United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000) ("A rejected claim does not merit rehearing on a different, but previously available, legal theory.")  However, where a petitioner collaterally attacks his conviction based on a claim of ineffective assistance of counsel where the petitioner has previously challenged the underlying deficiency, the petitioner has not merely repackaged the claim and the procedural bar does not apply.  See Perry v. United States, Nos. CV 610-074, CR 606-026, 2011 WL 1479081, at *4 (S.D. Ga. March 31, 2011) ("[T]he Court of

29

Appeals rejected the claim on the merits, while here it is raised on ineffectiveness grounds. Ineffective assistance of counsel was not an available theory on direct review, so . . . the Court rejects the government's contention that this claim is barred."); Willis v. United States, Nos. CV 608-116, CR 606-026, 2009 WL 1765771, at *4 (S.D. Ga. June 22, 2009) ("[T]he circuit court analyzed [petitioner's] claim for *judicial* error in the application of the sentencing guidelines. [Petitioner], in contrast, argues *attorney* error. . . .  Hence, unlike the movant in Nyhuis, he is not merely 'repackaging' his claim of judicial error as a claim of ineffective assistance of counsel.")  Accordingly, Petitioner is not merely repackaging his claim here, since he challenges Mr. Hawk's performance as ineffective.

However, Petitioner's ineffective assistance of counsel claim fails on the merits. Even though Nyhuis does not bar his ineffective assistance claim, the Eleventh Circuit rejected Petitioner's challenge to the sufficiency of the factual basis underlying his conspiracy to commit money laundering conviction and affirmed his conviction on direct appeal.  United States v. Ware, 580 F. App'x 880, 880 (11th Cir. 2014 ) (per curiam).  In support of its holding, the Eleventh Circuit cited Groendyke Transp., Inc. v. Davis, 406 F.2d 1158, 1163 (5th Cir. 1969), for the proposition "summary disposition is appropriate where 'the position of one of the parties is clearly right as a matter of law so that there can be no substantial question as to the outcome of the case.'" Ware, 580 F. App'x at 880.

Prejudice cannot result when counsel fails to raise a meritless issue.  United States v. Winfield, 960 F.2d 970, 974 (11th Cir. 1992).  Because, as the Eleventh Circuit held, there was a sufficient factual basis for his conviction, Mr. Hawk was not ineffective for failing to challenge the conspiracy to commit money laundering charge.  Accordingly, Petitioner is not entitled to relief on Ground Three.

## III.    CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** the § 2255 motion be **DENIED**, this civil action be **CLOSED**, and a final judgment be **ENTERED** in favor of Respondent.

SO REPORTED and RECOMMENDED this 17th day of April, 2018, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA